I believe the facts of this case set it apart from the breadth of case law that is applicable to the borrowed, servant, loaned, employee type cases we have to examine in this type of case. Whether on a fact level the manifesto of the evidence of these facts does permit the inference that the defendant, Sterling, was not the borrowing employer at the time of injury, or under a question of law, do the facts permit but one inference, and that is that Sterling was a borrowing employer? I suggest not. Each case is unique. As we know, there are a series of facts that are reviewed, unlike Sterling's reasoning that the moment Telesfero entered the front door, they could use him at their leisure, including overriding any type of restrictions or prohibitions. If that were the case, this Court would have no occasion to look at all the series of facts of each case, to analyze each factor, to consider the time of injury, exactly what Telesfero was doing, or to look at the terms of agreement. First of all, is the only evidence in the record of the contract, I don't know, it's marked as Exhibit Q, but it's a form that says the service card member agreement between client and Ron Staffing. Is that the evidence of this other contract? Is it the Q? Yes. Yeah, the front and back pages of that? Yes, I know there's a back page. I just have the front page in front of me. But is this what's supposed to be a contract between Ron Staffing and Sterling? Yes. Okay. Because is there anything in the record that would actually be a contract where you've got a signatory or you have a name of Sterling or anything? Well, that contract is the one that was provided by Ron's as the one in effect and provided to Sterling and signed. And you can see on the front page at the bottom there's a Michael Lewis signature. On the front page at the bottom? Yes. And you can see Michael Lewis. Okay, I don't have that. That's not in the record. Yes. The only thing I've ever seen is this Exhibit Q. But maybe I'm mistaken. It doesn't have the name in it, does it? Signature Michael Lewis, 10-2609, Vice President. What base stamp does that have? It's 10-2609. Well, what page in the record? You know how there's a base stamp? Yes, Justice. The page in the record is, I believe, Volume 3, 634. Right. Okay. That's what I'm looking at. I don't see anything on the bottom that has a signature. Does it have Exhibit 2 at the bottom of it? No. We're looking at something different. That's the back side. That's the back page, Justice. Okay, that's the front page. This is the front side. All right. And that is. All right. And the front side has service confirmation agreement with the company, Sterling Brands. Yeah. Ron Staffing. Sure. Okay. But are they in the record, like that, where there's a front and a back? Yes. Okay. There is. All right. Okay. And what happened originally was when I filed my response to a motion for summary and judgment, the front and back, which is one piece of paper, got mixed up. Okay. And only the front was provided. And then defense in its response provided the back page. All right. So there are two separate pages in there. Okay. All right. Well, let's assume for purposes of argument that this is a contract. Did anyone testify that this was the document, like either somebody from Ron's or Lewis? No. What happened, Justice, is that this document was found late in discovery after everyone testified. And as Judge Lawrence stated during the arguments, he did accept this as a controlling document for various reasons, I suspect. But I think it's clear from the manner in which this was handled that Michael Lewis testified there was an agreement in effect. Okay. All right. The defendants never produced one. All right. So there are a lot of cases, like you said, that discuss, you know, the loaned and borrowed employee situation. And actually there are several where the employee was at least attempting to sue in the borrowed situation, attempting to sue the borrowing employer. And in every case that I saw, the court, you know, concluded as a matter of law that the borrowed employee was actually an employee of the borrowing company. Is there a single case that you would like us to focus on that would be a loaned borrower kind of employee situation where you would suggest that supports your appeal? In terms of the written agreement information or? Just in general, I didn't really see a case that was, you know, the temporary agency. There's a lot of temporary agency cases. A temporary agency that loans employees on a regular basis to another company and then the employee or alleged employee, if you will, gets injured while working at the borrowed employer's company. And then the question, that particular employee sued the borrowing employer saying they were not protected by the Workers' Compensation Act because they were not an employee of the borrowing employer. And there wasn't a case I found that said, you know, so I'm asking you, could you at least direct us to one of those kinds of cases? Or if there isn't one, then doesn't that sort of not support your position? Justice, I would agree that this is a difficult subject. And my statement is that this case, with all the comparisons or distinctions you make with the existing case law, is illustrious of facts that far and above support the facts that were considered in all these other cases. Okay. He's an independent contractor is what you're really saying. Well, and that's an interesting question, Justice, because the case law, if you, the case law, the real question is, does the borrowing employer qualify for that status? The questions in the case law does not ask, if not, then what is that employee? The only question we see in the case law is, does that borrowing employer qualify? All right. Let's talk about Chavez then. First district case relied on an earlier case called Evans. In that case, the first district held that the employee there was borrowed by the employer and that that employer was able to have the protection of the workers' compensation act. How would you distinguish Chavez versus Transload? All right. First of all, Justice, I'd like to point out that the distinctions that I made in my briefs, that I would make today, I talk about Chavez, Cheney, Prodanek. Yeah. The distinctions all show the overriding nature of the control that was exercised, reserved, prohibited in our case by Iran's, not seen in any other case. What do you mean? Well, first of all, with Chavez, you asked about Chavez. Yeah. Some of the differences, and that was the offloading, the employee was offloading. Right. That was a ticket-only case where there was only a job ticket. No contract, no written contract to the extent that we see in this case. Okay. Let me ask you this. Don't you think that every single temporary agency has a contract when they send over their employees? Don't you think that they have a contract with the company that they're loaning to? I would hope so. I would likely agree with that. I don't know. I can't even envision that a temporary agency would not have a contract with the company that they're loaning their employees to. Now, I agree. Another distinction we see in Chavez is at the time of the injury, he was doing his job. He was doing the precise job he was temped out to do. Well, in Chavez, didn't the contract, or whatever you want to call it, the ticket, didn't the ticket specifically indicate that Tandem, and that's like Sterling here, Tandem, they were not allowed to use these employees in any dangerous or unprotected equipment? Yes. How do you get around that? They considered this idea. Yes. And the ticket-only issue was suggested to be not enough to establish some type of valid restrictions or prohibitions. What we do see from that, though, is that if you have a solid enough contract in contractual terms, like we have in RONs, that can override simply having only a ticket. Okay, what piece would you cite? Because aren't you really saying that a breach of an employment, a breach of a contract between two employers trumps the Workers' Compensation Act? I'm not saying that, Justice. What I'm saying is that every case is unique to its own set of facts. Yes. But in this case, doesn't the contract, if we accept it as true, say that the client retains the right to direct and control the work of the service employees? Isn't that in this contract? Yes, it does. But you can't look at that phrase alone, Justice, as we know in contract law. You look at the entire contract itself, and just above that, it says the client agrees that it will not require them to do these prohibited works. And that's the part that's highlighted. Chavez said the same thing. The fact that there's an agreement between the employers, the loaning and the borrowing, doesn't trump the Act. Because under, well, I guess, aren't you saying that this Act, that this particular person isn't really protected under these facts? No, what I'm saying is that the borrowing employer is not qualifying. Under all circumstances, we look to protect the employee. Right. The employer is the one who tries to qualify as the borrowing employer so they have the exclusivity protections. And what we do know, Justice, is that looking at the written agreement is a significant factor in deciding whether or not there is sufficient control exercised through the borrowing employer. Well, that's not what we're looking for. Is there a case where you have some written agreement between a lending and a borrowing employer where there's a violation of that written agreement, which overrides on-the-ground control? Because that's really what the cases are talking about, the right to control. Now, if the borrowing employer has a right to control and he violates some written agreement, is there any case out there that you can point to where that violation somehow converts it away from borrowing to independent contractor? Because, you know, that's essentially what you're saying. If the existence of this control, this paper, nobody can be a borrowing employer under that situation if that paper exists, right? No. I disagree, Justice, because if you look at the, there's a series of contract written agreement cases that are in the briefs. There's Reikland, O'Loughlin, Hastings, Chaney, Kawaguchi, A.J. Johnson, they all talk about looking at taking into account what's happened at the time of injury, what the agreement says regarding that nature of the incident. We don't have a case like this where there is an actual written agreement expressly stating reservations, prohibitions. So a restriction is going to override what you want us to find, is that this restriction and the violation of this restriction overrides the actual on-the-ground right to control the work of the employee. I'm asking that that creates a question of fact as to whether there was sufficient control. Isn't that through an issue of law, what we're talking about here? If it's undisputed that the borrowing employer, the alleged borrowing employer, could tell the employee where to go, what to do, what job to do, does that right to control and acquiescence by the employee override any other written restriction? Well, I would suggest that the case law, it depends on each set of facts. In some cases it may, in some cases it may not. What facts here would make the difference? Well, the facts that make the difference here is, as I've suggested, that it is crucial to look at the time of injury. At this time of injury, as they say, Hastings, where they actually looked at the hand signals that were occurring at that moment. How was he a non-employee? You tell us what facts support that this gentleman, who has obviously been injured very horrifically, what facts, though, at the time that he got injured, show that he was not an employee of Sterling? Well, Justice, the inquiry in the case law does not make that type of question. Like I've stated, the inquiry through the case law is, does the borrowing employer qualify? Not what status is the employee. Okay. But he'll always be an employee of Browns. So then tell us what facts support your argument that Sterling was not an employer at the time of the injury. Is that what you're saying? Look at it that way? All right. All right. And then are you going to say simply that this piece of paper means that he's not? No. Okay. There are other facts. What are the facts? But the crucial inquiry is, was there a sufficient degree of control? Right. At the time of injury, and I suggest there wasn't, because at the time of injury, he was doing something that was exclusively prohibited, restricted, not only by paper, but by similar testimony. And that is reflected, by the way, the manner in which Enrique Landeros reacted to this incident. But the borrowing employee, with Sterling, I think I understood you to say that at the time of the injury, he wasn't under the control of Sterling. Is that what you're saying? That Sterling wasn't controlling his activities at the time of the injury? Or did I misunderstand you? And that's possible. It's hard to get around the fact that Talesforo acted at the request of Sterling. And as suggested in Sterling's brief, Sterling Brands was able to override the restrictions, still less than qualified as someone controlling. Our position is, just because you say you can override these actual restrictions and prohibitions, doesn't qualify you to continue with that degree of control. If Mr. Talesforo had not been directed to go to the machine, are you then saying he is the borrowing under that circumstance? Yes, Justice. I have admitted that had he just been doing his job. Packaging. Packaging. And he got hurt, we wouldn't be here today. All right. Let me ask you this. What's the difference? What converts the difference? What made the right to control different? The right to control in this case was, as Landeros testified, by the safety supervisor for Rons. In the three years, they were never told about anyone. I know all that. But what is it about the fact that they told him to do a job that he was not, you know, arguably qualified to do? What converted that to a lack of control? They still had the same amount of control either way. In other words, this paper you have, Rons retained some degree of control. Yes. So what is it about this job that made them not have any control? In other words, there would never be a borrowing employer under your theory. No employee, no so-called borrowing employee could ever be a borrowing employee because this paper always existed whether they were asked to do something that violated it or not. I suggest to the Court that if they're going to go so far as to blatantly violate the already agreed-to terms, with respect to safety, and he was injured so severely doing something that was on four points squarely prohibited, then they do not further enjoy. They lose the enjoyment of the protection of the exclusivity provisions. So you're actually asking for a different type of remedy. You're asking for us to override this remedy because this employer's conduct was so wrong. No, what I'm saying is this becomes a question of fact. Or breach the contract so the exclusivity provisions of the Workers' Compensation Act no longer apply. Right. Then it becomes a question of fact. Because the borrower violates or somehow breaches or does something contrary to what the agreement does, that modifies the entire relationship between Sterling and Mr. Villasenor, Mr. Telesferro. I wouldn't say the entire relationship. Well, here's a scenario. Tell me this one. You have an employer who has violated OSHA regulations. His employee gets injured. Are we no longer under the Workers' Comp Act? Because the employer breached a duty that he was required to do under OSHA or some other standard, you know, a safe workplace? Does that take that employer out of Workers' Comp because he violated OSHA? No, not at all. That's an entirely different circumstance. And why is that? Because the reasoning behind the act is the following. That any time an employee is injured, that employer has an obligation to compensate that injured worker to the full extent of his injuries. That's the whole public policy behind the act. And the act incorporates the borrowing and the loaning situation. It's in the act itself. And the act provides that both of those employers are jointly and severally liable for the workers' compensation that that employee is absolutely entitled to. Right? Isn't that the purpose of the act? I mean, it's kind of twofold. It protects the employer from having to speculate or concern or whatever about a possible enormous judgment. But at the same time, the policy is to protect those workers so that they are fully compensated for their injuries that occur on the work site. And the act protects the employee in the sense that the loaning employer will always be liable for protecting them under workers' compensation benefits. Right. The question does become, does the borrowing employer enjoy those protections as well? And if that was the only inquiry, Justice, we would never have this body of case law that compares conducts and rights of control between loaning and borrowing employers. There is a separate body of case law outside the mere exclusivity provisions of an employee versus employer. All right. He's not an employee, though. All right. I know you say we're not supposed to be focusing on what Mr. Telesignore is. So what does Sterling, what are they if they're not an employer? What are they? That is a question that is not answered in the case law. But generally speaking, to determine whether someone is an employer, we always look at two things. We look at right to control and we look at whether the employee acquiesced. Right? I mean, that's pretty well established. We don't go outside the right to control or the acquiescence. Every single case here has that same equation. Yes. So under the equation, there's multiple summary judgment cases, and then we have Chavez, which is a motion to dismiss under 2619, a very similar procedure to summary judgment, wherein the courts concluded there was no other reasonable conclusion except that the person was an employee and the entity he or she was working for was an employer. And under the right to control issue, we look at what is contained in written agreements. And if you look back at... They ignore in its entirety what in fact happened? Again, I'm back to, so the written agreement is relied upon to modify what in fact happened. No, the written agreement is looked at at the time of injury. And in this case, it's especially pertinent. And our position is that if you look at that time of injury, I do not believe that in protecting the employee, the Illinois Workers' Compensation Act wants an employee to walk blindly into a building and do whatever is told almost at their own peril. It's really designed to protect the employee first. You never answered my hypothetical. I'm sorry. Okay. So you have an employer. They blatantly ignored standards, OSHA, ANSI, whatever. Clearly, the worker wasn't in a safe position. But they've been working for the company for 30 years. Now they're horrifically injured. Are you saying that because they didn't follow standards like OSHA, that now they're no longer an employee? No, of course not. They're no longer an employer. No, of course not. And they're still entitled to the protections of the workers? That's absolutely clear in the Workers' Compensation Act. So how does that scenario differ? Why isn't that employer still protected here? The original employer? Yeah, I'm sorry, Justice. I think you mentioned just an employee versus an employer. In the one scenario I gave you, you agree that that's an employer-employee situation, even though the employer violated some OSHA standard and the worker's in an unsafe state. That's what we're designed to protect. Okay. So how is that different from this case, where they breached some contract that they had with another party, not the employee? Because the Workers' Compensation Act is also sectioned out for a loaned employer versus a borrowing employer, and who can enjoy the exclusivity provisions. And that's why we have this body of case law that talks about rights to control. And within the issue of rights to control, we look at other factors, including what's in the written agreement and the conduct of the parties. And here we have Landero, not only a written agreement, but Landero's going to the plant saying, you can't have any of our employees back on this machine until you fix it. And they actually comply with this request. So that is a ratification, basically, of what is preexisting in your agreement, that you have control over some of these conditions, and that is when you can't let them work on dangerous machinery, heights, fall hazards. Everything that happened to Felsforo fits within the prohibitions of the agreement. So it's particular in this case, at the time of injury, when you're making the comparisons for the borrowing employer versus the loan employer, do they still enjoy the protections of the act? Right. And they may not. The actual employer will always enjoy the protections of the act for their own employee. Well, would there be, is there a single case that you know of in Illinois where there was a scenario of a temp employee going over to work for a borrowed employer where the court said they weren't, it wasn't an employer-employee situation? Justice, I cannot find, I have not been able to find a case, but I suggest to you. How about out of Illinois? I suggest to you. The workers' cap is pretty much uniform. I have not found a case. And I would suggest the reason. So this would be the one in a million. The reason we don't have that in these other cases, and that I think this case qualifies as an exception, is because the facts in this case have heightened control issues that are not seen in any other case. How did the employer not control him at the time of the accident? Let's hear the facts. If you say, raise the question. Other than that piece of paper that you keep referring to. Well, they did in fact ask him to go and work on this machine. Did he go? He did. Was he given instructions by their employee, the foreman? For about half an hour. Okay. And my position on that is that there was not enough consent for him to actually acquiesce to that type of control. He didn't choose at that point, upon being given the directive and instructions on how to manage the mixer, he didn't choose then to stop and say, wait a minute, I need to call Ron's. I mean, and he's not new to Ron's. He's been at Ron's since, what, 20-oh, he's been at Ron's a long time. But he himself, Mr. Villaseñor, did not stop and say, well, hold it, because if you want me to do something other than picking packing, I think is how we call it, I can't just do that. I've got to call Ron's and we've got to go through this particular protocol consistent with the service agreement. And just as I, one of the factors to look at is that he did not know what, there's no indication that he knew of any prohibitions or restrictions, and that's one of the reasons he cannot appropriately acquiesce or consent to that. There's no indication he did not know. I mean, we have basically simple labor individuals who are trying to make money and doing what they're told as best they can. Is there a difference between the packing work being identified as unskilled labor and working on the mixer as being skilled labor? And is it your position that Mr. Villaseñor could make no distinction with respect to the two job functions? Well, that is one of the factors to consider, yes. In addition to that, it's the first time ever he gets hurt within 40 minutes. He didn't have enough information as to the dangers and any of the restrictions that were known, that were supposed to be followed. He didn't have any information on that. So then your position is that he did not acquiesce because he didn't have enough information to know to acquiesce. Yes. All right. Anything further? You certainly will still have time for rebuttal. I'll serve for rebuttal. All right. Thank you. Mr. Coggins. Counsel, I forgot. What is your? Jason Coggins. Yes, Mr. Coggins. Okay. I didn't get it right. Mr. Coggins, you may proceed. Thank you. Good morning, Justices, Counsel, and may it please the Court. This case presents a textbook example of a borrowing employer relationship because we're talking about an employee that was involved with a temporary staffing agency that was loaned to a client business. And as Justice McBride had pointed out in the previous argument, I'm not aware of a single case involving a temporary staffing agency where it was not determined that there was a borrowing employer relationship as a matter of law. But hold on. Now you're on the hot seat. What case would you cite that had a contract like the one presented here with specific suggestions that the client agrees it will not require the service employees to perform the following prohibited work? And one of those is work off the ground six feet or higher. And forget about whether this is an accurate copy of the contract or not. Okay. We know that you contest that. Okay. Your Honor, first of all, there is a case, and I cannot cite it because it's unpublished. You can't cite it. So I cannot cite that. So can I cite a case that has that specific provision in the service confirmation agreement? And, of course, we dispute that it's admissible, but I'm assuming for the purpose of answering this question that you're going to consider it. Then, no, there's no specific case that has that exact provision. But Chavez is directly on point because there's no need for this. This was more like a little ticket, wasn't it? Well, it's the same thing. It's still a restriction. Whether it's in a ticket, whether it's in an agreement, it's still purporting to do the very same thing. It's still purporting to place restriction on the type of work that the employee does. But what we look at, and we know this from Chavez, is we look at what actually transpired on the job site, just similarly to a situation where a contract contains a label on the party's relationship that states that they are independent contractors. We don't just take a look. We don't just accept that blindly. That does not control. We look at what actually transpired on the job site to determine whether there's an employment relationship. So I do believe there's no meaningful distinction, even if I cannot cite a specific case that has that specific provision. I don't think there's any meaningful distinction between the provision in this service agreement and the work ticket. Even if we didn't take this paper, there was an employee of Ross. I think it was a woman. Elise Trigora? Didn't she provide extensive testimony about things that Sterling wasn't permitted to do with the temporary employees? She did, Your Honor. And she had absolutely no foundation to make those statements. Those statements cannot be relied upon for purposes of motion for assembly judgment. And why? Why? Because, number one, she was not – so just to go back – Are we supposed to take a look at all the pleadings, depositions, affidavits, everything on file? As long as it's admissible. Yes, absolutely. But it has to be admissible. Confident evidence only. Okay. And that's important. It's important because, in this case, she did not create the original relationship. You asked earlier in the argument about this service agreement. That was not the agreement that Sterling Brands believed governed this situation. And the real agreement in the evidence that we cite on page 3 of our appellate brief was back in 2005 or 2006, a letter written by Robert Kravitz from Ron Staffing. And what date stamp is that in the record? You have the copy in front of you. I have it in front of me, but I can only read to you the citation. Okay, I'm looking at your page 3. I'm sorry? I'm looking at page 3 of the brief. Okay. So, as you see in your statement of facts, it cites volume 3 at page 583 in volume 1. Okay. All right. But it's this document. It's a letter of agreement. It contains no restrictions whatsoever. But isn't that a predecessor company? Well, exactly. But when counsel told you that my client, Michael Lewis, the principal of Sterling Brands, testified that it was a written agreement, what he failed to say is that it was this agreement, because in the testimony in his deposition, it was specifically stated that he was referring to a letter of agreement that was written to Superior American, his predecessor company, that carried over to Sterling Brands. And what's significant is there are no restrictions in this agreement whatsoever. Okay. Assuming that this agreement, so assuming that we accept, and I know you disagree, that this is the agreement that was binding on the parties, does that change the scenario at all? Absolutely not. Absolutely not. Why? Because Travis controls, and because even if you consider all this evidence, and I still would like to come back and answer your question about Ms. Figueroa, but even if you consider every single piece of evidence that they advance, as a matter of law, it's just undisputed when you look at the actual facts that were taking place at Sterling Brands that every single factor that existed in Travis exists here. Sterling Brands controlled his work schedule. They trained him. They told him where to go. He agreed to do it. They had the right to discharge him from their facility. They trained him. They provided him safety equipment. Ron Staffing, another name, did none of it. They never, in fact, if you saw their statement of facts, Mr. Villasenor, when he was asked, well, what did they tell you when you went to Sterling Brands? He never said that there was any type of restriction on him. He never said that he didn't have an understanding that he was not going to be working on machines. They just said show up and perform work. And in fact, he was working on machines. That's clear in the record. Well, he was that day. No. He was also working in 2007 and 2009, the month before this. He had worked sometimes. It just didn't matter. And there was another machine. But aren't the cases also clear in that generally the right to control and whether the employee acquiesces, aren't those generally questions of fact? That is the standard. Judge, the cases do say that it's generally a question of fact. But when we look at every single temporary staffing agency, and in particular Travis, it's clear that when you look at all of the facts that are here, that all we are looking at is whether or not this man was directed by Sterling Brands, and then they're the employer. And the reason, as you pointed out earlier, is that we're talking about it. The inquiry here is under Section 184 of the Act. And the purpose is to provide financial protection to these workers, and that they can establish a joint civil liability with the bar employer being primarily liable. But the reason that's important is in some cases the loaning employer may not have insurance. The insurance company may be bankrupt or may be liquidated. So they need to have this financial protection. And so the central inquiry is, and you don't lose the status of the Workers' Compensation Act. You're still being employed with this employer if you're taking directions and you're following them. It wouldn't make any sense to try to create some exception. And there is no case out there that says just where you violate or reportedly violate an agreement that suddenly you forfeit the rights under the Act. There's no such case. I want to just quickly return to fully answer your question about Mr. Figueroa. It is in my statement of facts, but we kind of got sidetracked when you were talking about the agreement or that the work would be limited to packaging. That's not in any of the agreements that they're trying to rely on. But importantly, what I really want to get to, Justice McBride, is notably she was not involved in setting up the relationship between Ron's staffing and Sterling Brands. That was the salespeople. She testified, I never had a conversation with Sterling Brands before this accident, ever. And, in fact, he brought up Enrique Lendoros, who was also the safety manager. Same thing. He never had a conversation with Sterling Brands. Well, could she ever testify to any parole evidence regarding an agreement anyway? No, because she has no foundation to do it. I mean, and, in fact, that announces a parole. Even still, forgetting foundation, if there's a contract in place, someone can't testify to any other whatever. Parts of this agreement that aren't in the agreement. True. Offering parole evidence. True. And, as you pointed out earlier, this agreement, by the way, specifically stated that the client had the right to direct and control. And the work ticket that they bring up as well also said that the client business is to supervise the employee. So the facts on direction and control in this case are clear. They're capable of only one inference. That every time he went to Sterling Brands, he followed their direction. He had the same work schedule. He was treated the same as the other employees. He was told when to start, when to stop. I mean, I can go through the entire list, but every single factor that is in any of those temporary staffing agencies, and in particular the Chavez case, is present here. There's simply no question whatsoever that he was being directed and controlled at the time of this incident. They also brought up, in terms of the evidence that you were asking about, and I was saying that the service confirmation agreement should not be considered. I just wanted to note that one reason I specifically argued that is I sent a production request to Ron Stafford to ask for any contracts that were in effect on the date of this incident. The response I got back was none. I then took the deposition of Ivelisse Figueroa, the operations manager, and asked her, did you review your materials with regard to Sterling Brands? Yes, I did. Was there any agreement between the two? No. I found nothing. It was not until later that I sent some supplemental production request to request any and all agreements that were in place at any time that we then got that back. So no one has ever authenticated that service agreement. He mentioned a signature. It was not signed by Ron Stafford. No one ever authenticated that it was in effect at the time of this incident. And for that reason, we were saying it should not be considered, even though, Justice Collins, as I answered earlier, it doesn't matter. I mean, at the end of the day, even if all this evidence is considered, he still is directly in control when we look at the actual facts of what transpired. I also wanted to just point out, and it is in my statement of facts, but I wanted to point out that there is no foundation also for their argument that there was a preapproval inspection that was required. What is on the other part of that paper where there is a signature of Mr. Lewis? What was on the back page? Well, no, he says it's the front page. It contains his signature. The front of this thing. Yeah, the front page does contain a signature, and it's on the Sterling Brands, and it does say Michael Lewis. What else does it say? I don't have it in front of me. I looked at it before, but I don't have it in front of me. It provides that they're going to loan employees to Sterling Brands. I mean, that's the critical evidence. But does it refer to the back page too? Doesn't it? Honestly, I don't recall. All right. But significantly, there's no testimony by either of these individuals, the operations manager or Enrique Landeros, the safety manager, the two people from Ron Staffing that they're relying on for some of this testimony. Neither of them ever had a conversation with Sterling Brands. They never were involved in setting up this relationship. They did not know what the terms of the original agreement were. They did not know what was communicated from Ron Staffing to Sterling Brands. And in particular, they specifically did not know whether anybody had ever told Sterling Brands that there was any kind of restrictions whatsoever. So for those reasons, that's why we think that when they're trying to rely on the testimony of those two witnesses, there's just absolutely no foundation in the record to support it. It's just not an accurate presentation of the facts that are admissible, at least. And in point of fact, he was working on these machines. And he testified that Ron Staffing never told him about any type of restriction that was on his employment data set, show up to Sterling Brands and perform work. And then when he gets there, a Sterling Brands foreman tells him, go do something else. And he had been doing work on machines before. So it's just clear that all the meaning and all the facts of what actually occurred. They were directing him. He did follow it. And critically, Ron Staffing never had a supervisor out there to supervise him. They didn't have an office. Mr. Cagas, I have one question to you.  Where anyone with authority testified to the terms of this thing that's marked as Exhibit Q? Did any live witness ever testify to anything contained in this other than the Figueroa? And I don't know if she even did. That was – so – Was Mr. Lewis – I'll tell you this. I'll tell you this. Mr. Lewis, no. I can tell you Ms. Figueroa and Enrique Leto, no. The reason I was hesitating is it was finally produced. I think there might have been one deposition. Yeah, I know. It came up late in the proceedings. Right. Right. But then there was never like a redeposition of anyone to talk about this. No, that just sort of closed. Pardon me? That just sort of closed. Yeah, I know. But you can certainly ask. If somebody really wants to, they could ask to have it, you know. I can tell you that my client believes and believed that this 2006 was the controlling agreement, which contained no restrictions. And he also is under the impression that they were never informed of any restrictions. And the Robert Kravitz person from Ron Steffing, the salesperson that's on the bottom of this original agreement, he was out at Sterling Brands, unlike the other two Ron Steffing witnesses. And he did see the machines, and he testified that he assumed that the employees were working on these machines. Anything further, Mr. Packard? No, I would just add that I think the facts in this, I think Charles is clear that when you examine the actual facts at the time of the incident, and that the facts in this case are capable of only one inference. And for that reason, we would ask that you affirm the trial court's grant of summary judgment. Thank you very much. All right. I would only raise two brief points. One is that I just would like to remind the court that in Chavez, there was a distinction not only that it was only a time ticket, but when he was offloading at the time of his injury, he was injured doing what he was supposed to be doing within the limits in terms of whatever agreement they had. So unlike our case, there are no other prohibitions or anything on the ticket actually applied to that case. But did they raise the specter of doing something that wasn't permitted? No. So why did the court address that then? Why did they address the ticket? Yes, and I just looked at that, Justice. The ticket was raised disregarding some discussion on control, going through a number of facts discussing control. But it was actually not an issue in that case, the time ticket. All right. And I don't really want to belabor the contract, but I feel compelled to address the fact that Mr. Coggins has acknowledged that it's Mr. Lewis's signature on the contract that they failed to disclose during discovery, but would like to rely on something that goes back three years before that. And if you look at how these two companies conducted themselves, they conducted themselves within the confines of this contract. It must be inferred that Mr. Lewis was working within the terms of this contract. For example, even when they talk about the workers' comp provisions, the only way the loaning employer remains liable for workers' compensation is by a written agreement. And that's a misagreement. And that's who's paying the comp benefits. Because the statute, the Workers' Comp Act, doesn't set out, it permits an agreement to the contract. Yes, it does. But it has to be a written agreement or a waiver that the loaning employer shall remain responsible for the comp benefits. And that's what we have in this case. And there's a number of other factors. If you look at the first line, they mention it's not signed by everyone. But the client, it's effective as of the date the client signs on the reverse side. And so we know it's a one-page document, two-sided, Justice. All right. Just briefly, if you can, what did this one clause mean then? If it's not envisioned that they were still, you know, that they were an employer, a borrowing employer, what was this one provision in there for? If a service employee's injury, I'm talking about the very second paragraph, while performing duties other than those set forth on the reverse side hereof, or prohibited duties described below, which is one of these, okay, for any and all attorney's fees and costs directly related to workers' compensation for the injured party. What was that inserted for? What does that mean? That's a good question, Justice, but I think they're making a direct reference again to specific prohibitions and restrictions. Doesn't this suggest that there may be a situation where an employee loaned out is going to be doing something contrary to this and yet the only thing that the client is going to assume are the attorney's fees and costs related to that worker's complaint? Potentially, but that's not what we have in the case. That's not what has actually happened in this case. Well, wasn't the service employee injured doing something that was prescribed or described below? Isn't that what? Yes. So what's the point of this? It's a good question, but we know that who pays worker's comp is not the factor that decides. This isn't about who's paying the worker's comp. It's an agreement between the two that in that scenario, Sterling's going to pick up the attorney's fees, right? Isn't that what it says? It does say that. All right. I'm just wondering what that means. To me, it seems that it's envisioned that this very type of tragedy could occur and Ron's will still be, you know, paying worker's comp, but Sterling will pick up all the attorney's fees and costs directly related to the injury covered by the worker's comp act. And if that's what it means, it does not change the fact that they may not be qualifying as a borrowing employer at the time of that restricted or prohibited injury. Okay. Thank you, Justices. The case was very well argued and very well briefed, and we will take it under advisement. Thank you both.